UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CASSANDRA  WELCH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) No. 1:10-cv-01705-LJM-TAB |
| ELI LILLY  & COMPANY, | ) |
| | ) |
| Defendant. | ) |

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Eli Lilly & Company ("Lilly") has moved for summary judgment on all of Plaintiff Cassandra Welch's ("Welch's") claims brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981.  Welch contends that Lilly discriminated against her because of her race by (1) creating a hostile work environment; (2) denying her fair pay for her performance in 2002 and 2003; (3) failing to promote her when she changed jobs; and (4) retaliating against her by diminishing her responsibilities and terminating her because she had complained about discrimination.

For the reasons stated herein, the Court **GRANTS in part and DENIES in part** Lilly's Motion for Summary Judgment, Docket No. 90.

## I.  FACTUAL BACKGROUND

The facts in the light most favorable to Welch follow:

### A.  WELCH'S WORK ENVIRONMENT UNDER CANDY BOWSHER

Welch began her employment at Lilly on August 17, 1992, as an Utility Operator Trainee in Lilly's Parenteral Manufacturing Plant.  Dkt. No. 90-1, Denola Burton Aff. ¶¶

5, 6 & Ex. 2 thereto ("Burton Aff."); Dkt. No. 90-2, Welch Dep. at 123.  Over the next few years, Welch occupied several non-exempt Financial Assistant roles, including a promotion to Senior Financial Assistant in Accounts Payable in 1997.  Burton Aff. ¶ 6 & Ex. 2 thereto; Welch Dep. at 113-18.

In or around December 1999, Welch was promoted into a business integrator, exempt position in Scott Huston's ("Huston's") group with the Information Technology ("IT") department at Lilly.  Welch Dep. at 118-19.  In this role, Welch was promoted to a pay grade level 50 effective January 1, 2000.  Burton Aff. ¶ 6 ("Burton Aff.").

In or around January 2001, Candy Bowsher ("Bowsher") replaced Huston as Welch's supervisor.   Welch Dep. at 119; Dkt. No. 103-5, Neumann Dep. Ex. 6-L (referencing that March 2001 was approximately three months after Bowsher became Welch's supervisor).  Welch testified that under Bowsher's supervision, she was subject to expressly racially discriminatory and harassing comments.  For example, during Welch's first one-on-one session with Bowsher, Bowsher told Welch that "'people like you' are not expected to maintain the same knowledge and levels of advancement as the other Analyst in the group."  Dkt. No. 90-2, Welch Dep. Ex. 43, at 3.  Welch asserts that Bowsher often referred to Welch using the phrases "you people" or "people like you."  Similarly, during Welch's annual review in October 2002, Bowsher told Welch that her "expectations were too high" "for someone like [her]." *Id.* at 3.  In addition, Welch overheard Bowsher comment to another Lilly employee, Angela Huff ("Huff"), that "the worst thing about a nigger is one who thinks she is not." *Id.*  Further, Welch claims that during a 2002 "Consulting Pairs" meeting, Bowsher told Welch that blacks should not be paid as much as whites.  Welch Dep. at 525.  Welch claims that Bowsher replied that

Welch "should not even try to say this is an EEOC issue because [Bowsher] would ensure that 'another one of us' was hired asap [sic]."  Welch Dep. Ex. 43, at 2; Welch Dep. at 244.

Welch testified that she experienced other discriminatory behavior while working for Bowsher including being alternatively ignored and berated by Bowsher in front of Welch's co-workers.  Welch Dep. Ex. 43, at 2.  Bowsher would exclude Welch from team meetings.  *Id.*  Bowsher also told Welch that Welch was "a know it all" and "a [t]horn in her side."  *Id.*  Bowsher threatened to terminate Welch's employment if she told anyone.  *Id.*

Welch also testified that she experienced racial harassment by co-workers while reporting to Bowsher including a time when Welch found an "Aunt Jemima" label on her desk with a note that read, "I talked to your mama last night."  Welch Dep. at 520-22.  In addition, one of her white co-workers used the offensive epithet "nigger" on one occasion  *Id.* at 524.

Welch testified that she complained about race discrimination to her HR representative, Christopher Gunn ("Gunn").  *Id.* at 593.  Gunn, an African American, advised Welch not to make complaints of race discrimination because it would be "self-destructive," "[n]obody will support you," and "it's almost impossible to prove."  *Id.* 591-92.  Gunn remembers Welch mentioning various concerns about management style and culture that he occasionally shared with Bowsher's supervisor, Gary Martindale ("Martindale"), but Gunn testified that Welch never reported anything to him that he understood to be a claim of race discrimination.  Dkt. No. 90-3, Christopher Gunn Dep. at 54-55 ("Gunn Dep.").

### B.  WELCH TAKES ANOTHER INFORMATION TECHNOLOGY POSITION UNDER TODD ELLIOTT

In the second half of 2002, Lilly stopped using the software that Welch was supporting.  Welch Dep. at 589.  Welch applied, and was selected for, a position in Lilly's Parenteral IT department; the effective date for Welch's new role was October 1, 2002.  *Id.* at 119-20; Burton Aff. ¶ 5 & Ex. 2; Dkt. No. 90-6, Todd Elliott Aff. ¶ 3 ("Elliott Aff.).

Under Lilly's then-current job posting system, jobs were posted according to the title of the last person who held the open position.  Burton Aff. ¶ 11; Dkt. No. 90-7, Steve E. Hervey July 8, 2008, Dep. at 15-16 ("Hervey July 8 Dep.").  However, employees maintained the same pre- and post-transfer pay grade levels when the pay band for a new position encompassed the pay grade level from the employee's prior position.  Burton Aff. ¶ 11; Hervey July 8 Dep. at 17-21.

Apparently, Welch thought she had been promoted to pay grade level 54, since it was the level at which the new position under Elliott had been posted because it was the level achieved by Welch's predecessor in the role.  Burton Aff. ¶ 12.  However, Welch's position under Elliott was posted within her pay band; therefore, Welch's transfer was purely a lateral one and she stayed at the same pay grade level 50 that she had occupied under Bowsher.  *Id.* ¶¶ 5 , 11 & 12, & Ex. 2 thereto; Elliott Aff. ¶ 4.  In September 2002, Welch contacted Lilly's Human Resources ("HR") Department to inquire about why her pay and title had not been changed to reflect a promotion to pay grade level 54; Lilly's HR Representative Denola Burton ("Burton") explained Lilly's job posting system as described above.  Burton Aff. ¶ 12; Welch Dep. Ex. 34.

Although Welch's direct supervisor in this new position was Leader Todd Elliott

4

("Elliott"), Welch claims that two other men, Elliot's supervisor, Team Leader James Stefanek ("Stefanek"), and Stefanek's supervisor, Manager James Teleford ("Teleford"),[1] were also her supervisors.  Dkt. No. 103-4, Welch Decl. ¶¶ 2 & 4.

Welch testified that her merit increase for work she performed in 2002 was discriminatory because it was only 0.9%, or $480.00.  Burton Aff. ¶ 5 & Ex. 2, at 12 of 24.  Welch received this merit increase in April 2003.  *Id.*  Welch stated that this was the lowest merit pay increase Welch received at Lilly except for the previous year during which no Lilly employee received a merit increase.  Welch Decl. ¶ 10.  Merit increases at Lilly are determined by supervisors based on a computer tool that factors the employee's rank by their supervisor, the employee's salary grade level, and the employee's salary within that salary grade level to determine a range of merit dollars.  Dkt. No. 103-3, Christopher Gunn Dep. at 35-36 ("Gunn Dep.").  The final evaluation of an employee, which is used for input into the system calculating a merit dollar range, is finalized at the beginning of the year following the year being evaluated.  Dkt. No. 107-2, Gunn Dep. at 47; Dkt. No. 109-4, Elliott Dep. at 48.  Elliott testified that he would have administered Welch's merit increase for this year.  Elliott Dep. at 52.  However, Bowsher is the only supervisor that signed Welch's performance evaluation for the year 2002.  Dkt. No. 119-2, Schmid Decl. in Supp. of Mot. To Correct, ¶ 4; Dkt. No. 119-1, Ex. B-9, at LILLY-WELCH1310.

Welch states that Elliott told her that one of her co-workers, Jeff Moore ("Moore"), received a promotion from a pay grade level 54 to a pay grade level 56 when he

---

[1] The parties alternatively spell Teleford's name with ("Teleford") and without ("Telford") a second "e."  Lilly's responses to Welch's Interrogatories and Requests for Production of Documents in Lieu of 30(b)(6) Topics identifies "Teleford" as the appropriate witness; therefore, the Court has used "Teleford" throughout this Order.

5

transferred into the department.  Welch Decl. ¶ 7.  According to Welch, she and Moore "performed the same tasks for different project assignments within the same area for the same management teams."  *Id.* ¶ 6.  Where Welch reported directly to Elliott with respect to approximately 80% of her projects and to Stefanek with respect to the remaining 20%, Moore reported to Stefanek for approximately 80% of his projects and to Elliott with respect to the remaining 20%.  *Id.* ¶¶ 5 & 6.

## C.  WELCH COMPLAINS ABOUT HER WORK ENVIRONMENT UNDER BOWSHER

On April 14, 2003, Welch submitted a formal internal complaint of race discrimination to Lilly's Vice President of HR Pedro Granadillo ("Granadillo") and Executive Director of HR for IT Bob Klee ("Klee").  Welch Dep. at 239, 334 & Ex. 43 thereto; Welch Decl. ¶ 9.  In support of her complaint, Welch submitted a summary of some of the incidents she experienced under Bowsher and an indexed binder of approximately 125 to 200 pages containing "[s]upporting documentation."  Welch Dep. at 235-37 & Ex. 43 thereto.  Welch testified that she provided the binder to Klee, but it was never returned to her.  *Id.* at 238.  Although the summary did not contain the information about the "Aunt Jemima" label Welch found during her employment under Bowsher, she claims the information was in the binder.  *Id.* at 236-37 & 521-22.  In addition to her complaints about her treatment under Bowsher, Welch testified that the binder contained additional information about her broader allegations of racial discrimination at Lilly.  *Id.* at 237.

Lilly assigned HR Representative Daniel Neumann ("Neumann") to investigate Welch's allegations.  *Id.* at 232-33; Dkt. Nos. 90-8 & 103-5, Daniel Neumann Dep. at 19-23; 66-68 ("Neumann Dep.").  Although Neumann does not recall receiving a binder

of documents, he discussed the contents of the binder with Welch.  Neumann Dep. at 55-56.  At Neumann's request, Welch wrote a summary of her concerns.  Dkt. No. 90-9, Neumann Aff. ¶ 4; Neumann Dep. at 23; Welch Dep. at 242-43 & Exs. 43 & 45 thereto. After he received Welch's summary dated April 14, 2003, Neumann met with Welch several times to discuss each of the twenty-three (23) points in her summary and to identify those that required follow up.  Neumann Dep. at 23; Neumann Aff. ¶ 4; Welch Dep. at 242-43 & Exs 43, 45 thereto.  Neumann testified that for those issues for which Welch could not provide specific examples or concrete information, Neumann marked them as requiring no follow up.  Neumann Dep. at 59-60, 78-80 & Exs. 6-B, 6-I & 6-J thereto.

Neumann created his own summary of Welch's complaints about discrimination that he had determined warranted investigation and requested that Welch review it for accuracy.   Neumann Dep. at 35, 82-83 & Ex. 6-L thereto.   Welch agreed that it summarized some of her complaints, Welch Dep. at 237, but she signed Neumann's summary under the statement, "The following is a complete list of all actions and statements that Cassandra Welch has reported to the Company for investigation . . . ." Neumann Dep. Ex. 6-L.  The four items on Neumann's list included Bowsher's use of a racial slur in a conversation with Huff that Welch overheard; Bowsher's repeated use of the terms "you people" or "people like you" when referring to Welch, and Bowsher's statement that "people like Welch" are not expected to maintain the same level of knowledge as others in Bowsher's group; during Welch's year-end 2002 review, Bowsher referred to Welch as "you people," and when Welch inquired about whether or not Bowsher had any issues with her race or gender, Bowsher responded saying, "don't

even try to turn this into an EEOC issue, because she would ensure that another black female would be brought into the group asap [sic];" and during a Consulting Pairs session, Bowsher said she believed all people of color, particularly African-Americans, are not as intelligent, have more issues and are lazier than Caucasians, plus Bowsher conveyed that individuals in non-exempt positions had no follow up skills; all of which resulted in Welch being discriminated against in merit and performance expectations. *Id.* Based on Welch's agreement that these items accurately reflected her complaints, Neumann limited his investigation to Huff, Bowsher, the Consulting Pairs facilitators and Welch.  Neumann Aff. ¶ 5.

At Neumann's request, Burton, another HR representative, interviewed Huff regarding Welch's allegations that Huff witnessed Bowsher use a racial slur.  *Id.*; Burton Aff. ¶ 13; Neumann Dep. at 40.  Based in part on contemporaneously-taken notes from her conversation with Huff, Burton states that "Huff flatly denied ever hearing Bowsher make any racist remark."  Burton Aff. ¶ 13 & Ex. 3 thereto.  On May 29, 2003, Neumann noted that Huff had reported her findings to him regarding Welch's claim that Bowsher had used a racial slur during a conversation with Huff and that Huff had denied such had occurred.  Neumann Dep. at 40 & Ex. 6-F thereto.

Neumann himself interviewed Bowsher regarding all of Welch's concerns. Neumann Dep. at 34.  Bowsher denied using phrases such as "you people" or "people like you;" denied making derogatory comments regarding black people who think they are whites or half-breeds; denied saying "nigger;" and denied saying something to the effect that black people work less hard than white people.  *Id.*

In addition, Neumann interviewed the facilitators from Bowsher's and Welch's

Consulting Pairs session.  *Id.* at 28-29, 31, 36-38; Neumann Aff. ¶ 6.  Neumann met in person with Dane McCullough ("McCullough") and spoke on the telephone with Angela Williams ("Williams"), who was on maternity leave at the time.  Neumann Dep. at 36-38; Neumann Aff. ¶ 6.  Based on his discussions with the Consulting Pairs facilitators, Neumann concluded that the Consulting Pairs session between Bowsher and Welch was not productive, but also was not reflective of any race-based behavior.  Neumann Dep. at 31, 38-39.

Neumann concluded that there was no evidence to support Welch's claims that Bowsher engaged in any race-based behavior and shared his conclusions with Human Resources Director Redman.  *Id.* at 46; Neumann Aff. ¶ 7.  Neumann then met with Welch and shared his conclusions orally and in writing.  Neumann Dep. at 46, 93 & Ex. 6-U thereto.

### D.  WELCH'S WORK ENVIRONMENT UNDER TODD ELLIOTT

Welch testified that shortly after transferring to Elliott's department she complained to Elliott about the pay level of her job.  *Id.* at 178-81.  Elliott referred Welch to both Burton and Mike Roesner ("Roesner"), the HR representatives for her old and new departments, respectively.  *Id.* at 178.  She admitted that Burton told her Lilly's policy, but Welch claimed "[t]hat's not how the policy worked."  *Id.* at 180.

Welch's supervisors in her new position, Elliott, Stefanek and Teleford, were aware of her race discrimination complaint that was investigated by Neumann.  Welch Dep. at 352.  Welch testified that Elliott advised her not to file the complaint.  *Id.* at 352-53.

After Neumann issued his report in July 2003, Welch testified that Elliott told her

to "get the gunnysack off of [her] back" and to not bring issues that she had with race "over to his area." *Id.* at 347.  Elliott sent her to a holistic class, after which Welch and Elliott participated in a "relationship conflict management session with the [C]onsulting [P]airs" because she felt "it was a race discrimination issue . . . ." *Id.*  Welch also testified that during this time period she complained about job misclassification, racial harassment, racial slurs and epithets, and pay disparities to Elliott, Teleford, Stefaneck, Roesner, Dan Heighway, Marlene Burnell Griffith, Joy Mason, Derica Rice and Klee. *Id.* at 169 -71, 174.

During one of her conversations with Stefanek about Lilly's corporate policies or discrimination, Stefanek said, something to the effect of, "[T]hose yahoos can't tell us how to run it over here." *Id.* at 533 & 592.  Welch found this offensive because she thought Stefanek was referring to the policies and guidelines not being "applicable to black people, just white people." *Id.*  Welch testified that she reported this comment as well as other discrimination she was experiencing in Elliotts' department to Roesner, who responded that "Welch [was] not in corporate IT anymore, meaning management would not address by concerns there," and Roesner referred "to senior level management as nigger lovers" during this conversation. *Id.* at 592-93.  Welch reported Roesner's comments as racially charged to Roesner himself. *Id.* at 593-94.

In December 2003, Welch complained to Elliott about race discrimination that she felt she was experiencing in his area. *Id.* at 348.  Specifically, Welch complained about "pay, merit and a racial context [sic] and racial harassment that [she] felt was discriminatory." *Id.* at 348-49.

Elliott rated Welch "Satisfactory" in each of seven performance behavior

categories for her work in 2003.  Dkt. No. 103-6, Elliott Dep. Ex. 10-C, Welch Performance Management for Employees, 2003.  Welch was eligible to be considered for a merit increase based on her performance and received an increase of 2.2% of her base salary.  Dkt. No. 90-1, Burton Aff. Ex. 2, Welch Employee Job History, at 13-14 of 24.

In February 2004, Welch returned to her workspace after an African American History Month event and found a dark-skinned doll with a noose around its neck hanging from her desk.  *Id.* at 188-91, 349.  She was shocked to see "the number one symbol of hatred" at her workspace and wanted to call the police and Lilly security.  *Id.* at 191-92.  She "went to get [Elliott] immediately" because she "wanted him to see it." *Id.* at 191.  Welch told Elliott she wanted to call the police and security; instead, Elliott removed the doll and ushered Welch into a conference room "to talk . . . before [she] move[d] forward."  *Id.*  Elliott said, "this is what I deem as a bad joke."  *Id.* at 192. Further, Elliott advised Welch not to report the incident because the last thing she should want while trying to locate another job was an "EEO" claim.  *Id.* at 193.  Welch testified that Elliott further said that "[n]othing happened the first time you filed a race complaint.  The only thing happened [sic] is you got labeled as a troublemaker, it brought all kind[s] of havoc into your life."  *Id.* at 353.

Welch did not report it because she had "been through absolute hell with the other [EEO claim] and got nowhere," and she realized that with an ongoing investigation with the police and security about a doll with a noose around its neck, she "would automatically be froze[n] from applying for any other position until that investigation was complete."  *Id.* at 193-94.  Welch never saw the doll again and does not know whether

or not anyone else saw the doll.  *Id.* at 194-99.  She may have told Roesner about the doll, but does not recall telling anyone else at Lilly about it.  *Id.* at 199-200.

In May 2004, Welch met with Elliott, Stefanek and Teleford to complain about discrimination in the workplace.  *Id.* at 177-78.  Instead of doing anything about her complaints, Welch claims that Elliott ignored them or told her it was a relationship issue. Welch Dep. at 347, 352.  Teleford also ignored Welch's complaints and instead said that he wanted to help Welch help herself.  *Id.* at 174.  Further, Teleford repeatedly referred to Welch by the term "girlfriend," which Welch told Teleford she felt constituted racial harassment because "[i]t's a black slang thing" and asked him to stop using the term on two occasions.  Welch Dep. at 536-37.  Welch testified that Teleford used the same term "girlfriend" during the meeting at which she was fired.  *Id.* at 391.

After May 2004, Elliott transferred Welch's major, high visibility projects to Moore, a white male, and assumed responsibility for some of them himself.  Welch Dep. at 594. Welch testified that she was left with menial, and less career-enhancing, administrative and technical tasks that provided less direct interaction with senior level management. Welch Decl. ¶ 8.

Welch also testified that white, male co-workers in Elliott's department would break gas in front of her desk and, after she would ask if they needed TUMS or Rolaids, they replied "something about you people are used to smelling shit or this is a – something about this is a similar smell for blacks or something."  *Id.* at 538.  Welch claims that this happened on a regular basis.  *Id.*  Welch reported these incidents to Elliott, Stefanek, Teleford and Roesner.  *Id.* at 540.

### F.  WELCH IS TERMINATED BY LILLY

At some point during her employment with Lilly, Welch started a real estate business with Bryan Mitchell ("Mitchell"), a fellow Lilly employee who worked in a different division.  Welch Dep. at 276, 284.  That outside business, "Fair Players, Inc.," was not affiliated with Lilly in any way.  *Id.* at 267-68, 509-10.

In April 2004, Mitchell complained to Adam Hemmings ("Hemmings"), an HR representative in Mitchell's area, that Welch was harassing him.  Dkt. No. 90-10, John Adam Hemmings Dep. at 22 ("Hemmings Dep.").  Hemmings asked Mitchell to provide as many specific details as possible to aid Hemmings in his investigation.  *Id.* at 23-24.  Mitchell supplied Hemmings with a written statement explaining the nature of the alleged harassment, which appeared to stem from the deterioration of the real estate business.  *Id.* at 53-55; Dkt. No. 103-7, Hemmings Dep. Ex. 15-A.  Mitchell provided Hemmings numerous examples of electronic mail and voice mail messages sent to him by Welch using Lilly's electronic mail and voice mail.  Hemmings Dep. at 53-55 & Exs. 121 & 122 thereto.

Hemmings interviewed Welch a number of times to hear her side of the story.  *Id.* at 25-26; Welch Dep. at 260.  Welch denied Mitchell's allegations; and submitted her own nine-page written statement in which she disputed Mitchell's allegations and informed Lilly that Mitchell had been harassing her.  Hemmings Dep. at 60-61 & Ex. 16-A thereto.  In closing, Welch further stated that she believed Mitchell had "edited [her] emails to falsify the content to support his position."  Hemmings Dep. Ex. 16-A, at 9.  Welch also stated that Mitchell had access to her electronic mail account and deliberately deleted messages not previously saved to a disc to hide evidence that

13

Welch had completed some of Mitchell's Lilly work.  *Id.*

During the course of Hemmings' investigation, Mitchell provided Hemmings with a series of electronic mail exchanges between Mitchell and Welch that Mitchell reported to Hemmings were harassing because of their frequency and content.  Hemmings Dep. at 24.

Welch also provided Hemmings with hard-copy versions of electronic mail.  *Id.* at 31.  Some of the electronic mail messages Welch provided to Hemmings contained different content from those provided to him by Mitchell, even though the date and time stamp were the same with similar subject lines.  *Id.* at 30-31; 90-104 & Exs. 19-A, 19-C, 19-E, 19-H, 19-J, 19-M, 19-O, 19-Q & 19-S thereto.

Hemmings enlisted the help of a Lilly IT Security Consultant, Patrick "Butch" Gorsuch ("Gorsuch"), to investigate which electronic mail had been altered and by whom.  *Id.* at 32-33, 87-89.  Gorsuch explained to Hemmings how to examine the metadata associated with the electronic mail messages at issue.  *Id.*  After his examination of the electronic mail on Lilly's server, Gorsuch reported to Hemmings his conclusion that the metadata showed Welch had altered the electronic mail messages.  *Id.* at 32-33.  Hemmings knew that Mitchell may have had access to Welch's electronic mail account and that Gorsuch's investigatory technique could not tell which person had actually accessed the account; therefore, Hemmings made a message by message assessment to conclude whether or not he felt falsification had occurred.  *Id.* at 87-89.  Altogether, Hemmings identified seven electronic mail messages that he concluded Welch had altered and then submitted to Hemmings in conjunction with the harassment investigation.  *Id.* at 90-104 & Exs. 19-C, 19-C, 19-H, 19-J, 19-M, 19-O & 19-Q.

14

Misconduct, including falsification of documents, is grounds for immediate discharge at Lilly.  Burton Aff. ¶ 4.  After concluding that Welch had falsified documents she had submitted during the course of a Lilly investigation, Hemmings consulted with others, including Roesner and Teleford.  Hemmings Dep. at 35-36; Dkt. No. 90-12, James Roesner Dep. at 41 ("Roesner Dep.").  Hemmings, Roesner and Teleford agreed that Welch should be discharged for misconduct.  Hemmings Dep. at 37-38; Roesner Dep. at 43-45.

On the morning of June 8, 2004, Hemmings and Roesner met with Welch to advise her of Hemmings' investigation results.  Hemmings Dep. at 37-38; Roesner Dep. at 43-46.  Later that day, Welch was called into a meeting with Teleford and Roesner.  Roesner Dep. at 45-47.  On her way to the meeting, Welch passed Elliott in the hallway; Welch testified that Elliott said to her, "We got [sic] your black ass now."  Welch Dep. at 387.  At the meeting, Welch states that Teleford referred to Welch as "girlfriend" again.  *Id.*  Teleford and Roesner informed Welch that her employment was being terminated on the grounds that she had falsified electronic mail.  Roesner Dep. at 45-47; Welch Dep. at 525.  Elliott did not participate in the discharge meeting nor did he participate in Hemmings' investigation.  Elliott Dep. at 40-41; Elliott Aff. ¶ 8; Roesner Dep. at 46.  However, a document Lilly submitted to the Indiana Civil Rights Commission states: "Thus, Mr. Elliott, Mr. Teleford, and Mr. Roesner agreed that [Welch's] employment should be terminated.  They communicated their decision to her on June 8, 2004."  Dkt. No. 103-10, Schmid Decl. ¶ 3 & Ex. I-1 thereto, Lilly's Response to Welch's Ind. Civil Rights Comm'n Charge, Dkt. No. Emra04100511; EEOC No. 34FA500039, at LILLY-WELCH00006405 ("Lilly's ICRCC Response").

15

## II. <u>EVIDENTIARY ISSUES</u>

### A. COMPARITOR JOB HISTORIES

Lilly moved for summary judgment on all of the Welch's claims.  Dkt. No. 91, at 2.  However, Lilly provided no argument in its brief with respect to Welch's claims that she was discriminated against when she received a 0.9% merit pay increase in 2003, and when she received a 2.2% merit pay increase in 2004, apparently because "the manner in which Welch present[ed] her allegations ma[d]e it difficult to identify and analyze her actual legal claims."  *Id.* at 14.

In her Response, Welch asserted that by failing to argue the merits of Welch's pay claims, Lilly forfeited its right to do so and those claims should proceed to trial.  Dkt. No. 103, at 23-24 (citing *Chloe v. City of Indianapolis*, 712 F.3d 1171 (7th Cir. 2013).  Welch then cites several paragraphs in her Complaint that put Lilly on notice of these claims.  *Id.* at 24 (citing Dkt. No. 1, Compl. ¶¶ 31-60, 75, 79, & 84).  Welch also argues that Lilly questioned Welch about these claims at her deposition and had an interrogatory response from which to discern who Welch considered similarly situated employees.  *Id.*  Welch claims that Lilly should have sought a more definitive statement under Rule 12(e) or moved to dismiss Welch's claims under Rule 12(b)(6) if it considered Welch's Complaint too vague to discern these claims.  *Id.* at 24 n.5.

Lilly contends that the cited portions of Welch's Complaint largely address equal pay issues with respect to Lilly's performance management process in general and as applied to Welch, but not Welch's allegations regarding the specific increases in April 2003 and April 2004.  Dkt. No. 107, at 2.  Moreover, Lilly asserts that no forfeiture occurred because Welch was on notice that Lilly was moving for summary judgment on

all of her claims and should have responded accordingly. *Id.* at 3. Further, Lilly's Reply was also filed "'in support' of Lilly's motion for summary judgment," and the Court could allow Welch to respond to Lilly's arguments on the pay issue if necessary. *Id.* at 3 & n.2. In arguing the merits of Welch's pay claims, in part, Lilly asserts that Welch failed to establish her *prima facie* case because there is no evidence that comparable employees were treated differently or that the pay increases were materially adverse. *Id.* at 3-5.

In Surreply, which the Court allowed Welch to file in part because of Lilly's arguments in Reply regarding her pay claims, Welch reasserts her contention that Lilly forfeited its right to argue summary judgment as to her pay claims. Dkt. No. 109-1, at 1-2. In the alternative, Welch argues that if the Court will not strike Lilly's arguments regarding her pay claims, it should order Lilly to produce documents regarding the employment histories and performance evaluations for Huff and Moore. *Id.* at 3. Welch argues that she requested such information in her first request for production of documents (apparently served in or around April 2011), but upon her subsequent follow-up on the issue in April 2013, Lilly refused to produce the documents. *Id.* at 3-4. Welch's original request was very broad, but in April 2013, she narrowed the request to documents specifically related to Huff and Moore. *Id.* at 4 (citing Dkt. No. 109-3, Supp. Schmid Decl. ¶ 7 & Ex. B-3 thereto, at 1). *See also* Dkt. No. 100, Minute Order for Proceedings Held Before Magistrate Judge Tim A. Baker, at 1 ("Minute Order"). Apparently, Lilly refused to produce them "on the grounds that they 'are irrelevant to Plaintiff's claims' and 'were neither requested nor pursued during discovery.'" Dkt. No. 109-1, at 4 (citing Supp. Schmid Decl. ¶ 8 & Ex. B-6 thereto, at 1).

On April 29, 2013, Magistrate Judge Baker held a conference with the parties to discuss the discovery dispute. *See* Minute Order, at 1. Magistrate Judge Baker understood that Welch wanted to use the disputed documents to respond to Lilly's pending summary judgment motion. *Id.* After assessing the parties' arguments, he concluded that Welch's "request for this information at this stage is untimely and is denied." *Id.* at 2. Citing a similar ruling in another case, *Corre Opportunities Fund v. Emmis Communications Corp.*, 1:12-cv-491-SEB-TAB (Apr. 10, 2012), Magistrate Judge Baker listed three reasons for his conclusion:

> First, the two-year delay [between the request for documents and Welch's follow up] is extensive. Second, [Welch] admittedly failed to follow up and has no good explanation for this failure. Third, during this extensive delay there have been other discovery issues brought to the Court's attention, deadlines extended, and a summary judgment motion filed.

Minute Order, at 2.

Welch asserts that the Court should require Lilly to produce the comparative information now because Lilly admits it is relevant information and Lilly relies upon the absence of the information to defeat Welch's pay claims. Dkt. No. 109-1, at 5. If the Court concludes that Lilly should be allowed to argue the issue, "[w]ithout the documents, Plaintiff will be unable to present to the Court evidence necessary to rule on Plaintiff's pay claim," and the Court should order Lilly to produce the documents and allow Welch to properly respond. *Id.* at 5 -6 (citing Supp. Schmid Decl. ¶ 10 & Fed. R. Civ. P. 56(d)).

The Court concludes that Welch was on notice that Lilly intended for the Court to evaluate all of her claims on summary judgment, which is the standard discussed in *Cloe*, and that Welch's objection to Magistrate Judge Baker's ruling on the discovery

dispute regarding comparator evidence, couched as a Rule 56(d) issue, is without merit. Welch argued to Magistrate Judge Baker in April 2013, that she needed the comparator data to properly respond to Lilly's summary judgment motion because Magistrate Judge Baker specifically stated that was why Welch needed the information in his Minute Order.  Minute Order, at 1.  Further, Welch was certainly on notice of Lilly's arguments that summary judgment was appropriate even as to those claims when Lilly filed its Reply.  Welch had the opportunity to address Lilly's argument in Surreply, particularly under the Court's permissibly-worded Local Rule regarding such filings.

Turning to Welch's claim of prejudice if the Court does not compel Lilly to produce comparator data, Welch brought her dispute about Lilly's failure to produce employee records for Huff and Moore to Magistrate Judge Baker.  After holding a telephonic conference at which Welch's counsel appeared, Magistrate Judge Baker concluded that Welch's request was untimely and he declined to compel Lilly to produce the documents.  *Id.* at 1-2.  Four days later, Welch filed her Response, in which she fully articulated her pay claims and her forfeiture argument, but did not raise any objection to Magistrate Judge Baker's Order.  In addition, Welch never later objected to Magistrate Judge Baker's Order within the fourteen-day deadline in Rule 72(a).  Instead, in her Surreply Welch reiterated her forfeiture argument and asserted that Lilly improperly withheld the discovery and objected to her attempts at comprise two years after she served her original, broad requests.

On this record, the Court is convinced that Welch was well aware that Lilly intended to seek summary judgment on all of her claims, regardless of whether they were fully articulated in her Complaint or later developed as the evidence progressed,

including any pay discrimination claim:  Welch brought her discovery dispute over the issue to Magistrate Judge Baker so that she could obtain the discovery before she needed to respond to Lilly's motion for summary judgment.  Welch has now put the Court in the difficult position of deciding a discovery dispute in the midst of deciding summary judgment.  As Lilly pointed out, such a practice is disfavored.  *See Packman v. Chi. Tribune Co.*, 267 F.3d 628, 647 (7th Cir. 2001); *Taflinger v. Hindson*, 870 F. Supp. 2d 598, 602-03 (S.D. Ind. 2012).  Further, from the absence of any reference to Rule 72(a) in Welch's pleadings, the Court is left with the impression that she is trying to circumvent that rule in favor of the standard under Rule 56, where she may perceive that relief is more freely given.  *See, e.g.*, *Craig & Landreth, Inc. v. Mazda Motor of Am., Inc.*, 75 Fed. R. Serv. 3d 960, No. 4:07-cv-0134-SEB-WGH, 2010 WL 107346, at *1 (S.D. Ind. Jan. 6, 2010) (stating that "[t]he purpose of rule 56[(d)] is to safeguard against a premature grant of summary judgment; accordingly, courts construe the rule liberally") (citing, *inter alia*, *King v. Cooke*, 26 F.3d 720, 726 (7th Cir. 1994)).  Under either Rule, the Court concludes that Welch is not entitled to further discovery.

Rule 72(a) required Welch to object to Magistrate Judge Baker's ruling within fourteen days.  Fed. R. Civ. P. 72(a).  Having failed to do so, the Court could, in its discretion, decide that Welch's request for a review is too late.  *See Jean v. Dugan*, 29 F. Supp. 2d 939, 941 (N.D. Ind. 1998).  Nevertheless, the Court is mindful of the Seventh Circuit's view that a District Court Judge may review a non-dispositive decision of a Magistrate Judge even if there is no timely objection.  *See Schur v. L.A. Weight Loss Ctrs., Inc.*, 577 F.3d 752, 760-61 (7th Cir. 2009).  The Court "shall modify or set aside any portion of the magistrate judge‐s order found to be clearly erroneous or

contrary to law.@  Fed. R. Civ. P. 72(a).  Using the clear error standard, the Court will overturn the Magistrate Judge=s ruling in the instant case Aonly if [it] is left with the definite and firm conviction that a mistake has been made.@  *Weeks v. Samsung Heavy Indus., Ltd.*, 126 F.3d 926, 943 (7th Cir. 1997).  Magistrate Judge Baker's decision is neither clearly erroneous nor contrary to law.  The Court is well within its discretion to put time limits on discovery, as it did in this case by adoption of a Case Management Plan.  Under the Case Management Plan, and multiple revisions thereto by motions of the parties, liability discovery in this matter closed on March 11, 2013.  *See, e.g.*, Dkt. Nos. 30 (setting an original discovery deadline of February 10, 2012), 42 (resetting deadlines), 47 (approving an amended case management plan resetting deadlines), 74 (resetting deadlines) & 89 (resetting deadlines).  The dispositive motion deadline was March 4, 2013, and Lilly filed its Motion for Summary Judgment on that date.  Dkt. Nos. 89 & 90.  Although discovery had not closed when Lilly filed its summary judgment motion, Welch filed, and was granted, three motions for time to respond to Lilly's motion, which extended her deadline to file a response to May 3, 2013.  Dkt. Nos. 93, 94, 95, 96, 98 & 99.  Further, Welch waited until on or around April 23, 2013, to bring her discovery dispute to Magistrate Judge Baker's attention.  Dkt. No. 97, Order Setting Telephonic Status Conference (stating that "[t]he purpose of this conference is to address a discovery dispute").

Under the facts here, as Magistrate Judge Baker aptly stated, "The problem is that Plaintiff's request is untimely."  Dkt. No. 100.  Welch served her discovery requests for comparator information in April 2011, but despite multiple extensions to the discovery deadline and multiple discovery disputes brought to the Magistrate Judge in

the interim, Welch failed to follow up with Lilly on those requests until April 2013, two years after service of the requests and a month after discovery closed.  In light of these facts, Magistrate Judge Baker properly denied Welch's belated motion to compel.

Welch's motion under Rule 56(d) fairs no better for the same reason.  According to the Seventh Circuit, "A party seeking the protection of Rule 56(f) must make a good faith showing that it cannot respond to the movant's [evidence]" and "must clearly set out the justification for [any] continuance."  *Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049, 1058 n.5 (7th Cir. 2000) (quotations and citations omitted).  The necessary justification is lacking "[w]hen a party fails to secure discoverable evidence due to [her] own lack of diligence."  *Id.* (quotations and citations omitted).  *See also Grayson v. O'Neill*, 308 F.3d 808, 816 (7th Cir. 2002) ("Where a party's own lack of diligence is to blame for that party's failure to secure discoverable information, it is not an abuse of discretion to deny a Rule 56(f)[, now  Rule 56(d),] motion."), *cert. denied*, 540 U.S. 824 (2003).  Here, as outlined above, Welch waited two years before she followed up with Lilly on the relevant discovery requests, despite multiple extensions to the discovery deadline and other discovery issues that were brought to the Court's attention during that time.  Therefore, Welch has "fail[ed] to secure discoverable evidence due to [her] own lack of diligence" and "the necessary justification is lacking" to grant her additional time to procure the discovery.  *Kalis*, 231 F.3d at 1058 n.5.  Welch's motion to compel additional discovery under Rule 56(d) is denied.

## B.  NATIVE FORMAT ELECTRONIC MAIL

Welch claims that Lilly "wholly failed to preserve [the electronic mail documents] and associated metadata" that provided the basis for Hemmings' conclusion that Welch

altered the documents.  Dkt. No. 103, at 11.  Welch further complains that she needed the "native format email files, which an expert would be able to analyze in the same way Defendant claims it analyzed the emails metadata."  Dkt. No. 109-1, at 10.  Without the documents, Welch asserts that she is unable to effectively cross-exam Lilly's witnesses.  Dkt. No. 103, at 11.  Welch argues that she is unfairly prejudiced by admission of this evidence in the absence of access to the original documents themselves and/or is entitled to a spoliation instruction or remedy of some kind.  *Id.* at 11 (citing Fed. R. Civ. P. 56(c)(2) & Fed. R. Evid. 403); *id.* at 32 n.8.  In addition, Welch claims that she is entitled to present to the jury her argument that Lilly failed to preserve this evidence, which further supports her claim of racial animus.  Dkt. No. 109-1, at 10-11.

Lilly contends that it produced the emails Welch provided to Hemmings and a disk containing the image files with the metadata notes that Hemmings relied upon to make his determination that Welch altered the documents.  Dkt. No. 107, at 9-10.  Moreover, Lilly asserts that some of the electronic documents submitted by Welch could not be located during Hemmings' original investigation, "accordingly they did not exist at the time and could not be produced as part of this investigation."  *Id.* at 10.  Lilly also argues that Welch never raised this issue during discovery; therefore, the Court should reject Welch's request for any spoliation remedy.  *Id.* (citing *Rodgers v. Eli Lilly & Co.*, No. 1:11-cv-306-JMS-DML, Dkt. No. 57 (S.D. Ind. July 17, 2012); *Bracey v. Grondin*, 712 F.3d 1012 (7th Cir. 2013)).

Similarly to her motion regarding comparator job histories, Welch's argument amounts to a motion to compel or a motion for sanctions that is too late.  As previously discussed, the discovery deadline in this matter was originally set for February 10,

2012, and through multiple motions, was extended to March 11, 2013. *See* Dkt. Nos. 30 (setting an original discovery deadline of February 10, 2012), 42 (resetting deadlines), 47 (approving an amended case management plan resetting deadlines), 74 (resetting deadlines) & 89 (resetting deadlines).  At no time prior to the briefing on the instant motions did Welch raise the issue of native format emails.  Repeating the conclusion of Magistrate Judge Baker, "The problem is that Plaintiff's request is untimely."  Dkt. No. 100.  *See also Carmichael v. Richards*, 307 F. Supp. 2d 1014, 1023 n.10 (S.D. Ind. 2004) (stating that a summary judgment brief is not the appropriate forum to raise a discovery issue).

Further, to the extent that Welch seeks a ruling that she is entitled to a spoliation remedy, she has failed to evidence that Lilly destroyed the electronic mail in bad faith. Welch has the burden to show that any destruction that occurred (and Welch has not even shown that since she never asked for native format electronic mail in discovery or moved to compel production of same) was "'for the purpose of hiding adverse information.'"  *Bracey v. Grondin*, 712 F.3d 1012, 1019 (7th Cir. 2013) (quoting *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 644 (7th Cir. 2008), further citation omitted).  The Court is unsure of what "adverse information" Welch contends was contained in the native format electronic mail because, other than the metadata, Lilly did not look at any other information related to those files.  In any event, there is no evidence that Lilly intentionally destroyed the electronic mail.

Moreover, to the extent Welch argues that the electronic mail is hearsay, the Court cannot agree.  Lilly is not proffering the documents for the truth of the matters asserted therein; rather, it is offering them as evidence of what Hemmings relied upon

when he determined that Welch, not Mitchell, had altered them.  As such, they are not hearsay.

For all of these reasons, the Court declines Welch's invitation to strike, disregard or draw an adverse inference with respect to the electronic mail documents that formed a basis for Hemmings' conclusion that Welch altered them.

### III.  <u>SUMMARY JUDGMENT STANDARD</u>

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  *See also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267–68 (7th Cir. 1990).  Motions for summary judgment are governed by Federal Rule of Civil Procedure 56(a), which provides in relevant part:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials showing that a fact either is or cannot be genuinely disputed.  Fed. R. Civ. P. 56(c)(1).  A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986);

*Goodman v. Nat'l Sec. Agency, Inc.*. 621 F.3d 651, 654 (7th Cir. 2010).  It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying applicable evidence.  *See Goodman*, 621 F.3d at 654; *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party.  *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996).  The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment.  *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996).  Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute.  *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992).  If the moving party does not have the ultimate burden of proof on a claim, it is sufficient for the moving party to direct the court to the lack of evidence as to an element of that claim.  *See Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 & n.3 (7th Cir. 1994).  "If the nonmoving party fails to establish the existence of an element essential to [her] case, one on which [she] would bear the burden of proof at trial, summary judgment must be granted to the moving party."  *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996).

# IV. DISCUSSION

## A. RACIAL DISCRIMINATION

Welch asserts that Lilly discriminated against her on the basis of race in terms of pay and a promotion and when it discharged her.  Dkt. No. 103, at 23-32.  Specifically, Welch claims that Lilly awarded her discriminatorily low merit increases in 2003 and 2004.  *Id.* at 23-24.  Further, Welch contends that Lilly failed to promote her to a pay grade level 56 when she transferred to Elliott's group because of her race.  *Id.* at 25-29. Welch also argues that she has direct evidence that her termination was racially motivated because, just prior to her termination, Elliott told her, "We got your black ass now."

To the contrary, Lilly asserts that Welch cannot succeed on her claims that Lilly discriminated against her with respect to pay because she has not shown that similarly situated employees were treated differently.  Dkt. No. 107, at 3-5.  Further, Lilly argues that it followed its policy when Welch transferred into the Parenteral IT group and Welch has no evidence as to why Moore's alleged transfer might have occurred, which fails to suggest a discriminatory motive for Welch's lateral transfer.  *Id.* at 6.  In addition, Lilly contends that it had a legitimate non-discriminatory reason for terminating Welch's employment and there is no evidence that this reason is pretextual.  *Id.* at 7-12; Dkt No. 91, at 19-21.

Welch may evidence her discrimination claims either directly or indirectly.[2]  *See*

_____

[2] "The substantive standards and methods of proof that apply to claims of racial discrimination and retaliation under Title VII also apply to claims under § 1981."  *Smith v. Bray*, 681 F.3d 888, (7th Cir. 2012) (citing *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403-04 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008)).  However, Welch argues that a different causation standard should apply to her retaliation claims under § 1981 after the

*Coleman*, 667 F.3d at 845.   Under the direct method, Welch "may avoid summary judgment by presenting sufficient evidence, either direct or circumstantial, that the employer's discriminatory animus motivated an adverse employment action."  *Id.*  Welch may also proceed under the indirect method, which requires that she establish "a prima facie case of . . . discrimination," which includes establishing that: (1) she is a member of a protected class; (2) her job performance met Lilly's legitimate expectations; (3) she suffered an adverse employment action; and (4) another similarly situated individual who is not in a protected class was treated more favorably than Welch.  *Id.*  Once she establishes a prima facie case, the burden shifts to Lilly to articulate a legitimate non-discriminatory reason for the employment action.   *Id.*   Then, Welch would have the burden to establish that Lilly's reason is a pretext, or "that [Lilly] is dissembling."  *Id.* at 852 (quoting *Naik v. Boehringer Ingelheim Pharma., Inc.*, 627 F.3d 596, 601 (7th Cir. 2010) (further citations omitted)).

### 1.  Pay Disparity Claim

Welch's claims based on any alleged pay disparity fail because she has presented no evidence to substantiate that the raises she received were discriminatorily low.  With respect to such evidence, Welch relied almost exclusively on her argument that Lilly waived its right to seek summary judgment on the issue or that she is entitled to additional discovery to obtain comparator data from Lilly.  Dkt. No. 103, at 23-24; Dkt. No. 109-1, at 1-6.  The Court has concluded that Welch's lack of diligence forecloses her entitlement to additional discovery.  In addition, Welch has made no showing that she could not have obtained the information from another source, such as the

---

Supreme Court's decision in *University of Texas Southwestern Medical Center v. Nassar*, 133 S.Ct. 2517 (2013), which the Court will address later in this Order.

comparator employees themselves.   Further, her testimony regarding Bowsher's statement to the effect that blacks should be paid less than whites, which Welch testified occurred during a Consulting Pairs meeting some time in 2002,[3] is lacking a temporal relationship to the pay decision in 2003.   Welch presented evidence that Bowsher was the only supervisor who signed her review for 2002, which supports an inference that Bowsher was the supervisor with major input on Welch's rating; however, under the Lilly system for merit increases, it was Elliott who would have administered the process by which Welch's pay increase for that year was decided.   Gunn Dep. at 35-36, 47; Elliott Dep. at 48, 52.   Moreover, even if Bowsher's statement had a temporal connection and Bowsher determined Welch's merit increase for that year, there is no evidence that the pay raise Welch received was low compared to other raises given that year to other similarly-situated employees.   Similarly, Welch has no evidence that the pay raise she received the following year (in 2004 for performance in 2003), was discriminatorily low.   As such, under the direct method, Welch has not shown that the pay decisions were adverse; and under the indirect method, Welch has not evidenced that other employees similarly situated were treated differently.

## 2. Failure to Promote Claim

Welch claims that Lilly's failure to promote her from a pay grade level 50 to a pay

---

[3] Neither party in this case made it easy for the Court to decipher the timeline of the relevant events.   Although not required to do so, the Court endeavored to "scour the record" to piece together a timeline and present it in the light most favorable to Welch as required by Rule 56.   As a result of the lack of a clear sequence presented by the parties, any errors the Court made in the temporal relationship of the relevant events will, necessarily, weigh against Welch because she bears the burden of proof on her claims.   *See Raymond v. Ameritech Corp.*, 442 F.3d 600, (7th Cir. 2006) (stating that even under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), plaintiff "bears the ultimate burden of proof") (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)).

grade level 56 upon her transfer into the Parenteral IT department was discriminatory because Elliott told her that Moore was promoted from a pay grade level 54 to a pay grade level 56 when he transferred to the department.  Dkt. No. 103, at 25-26; Dkt. No. 109-1, at 7-8.   Even if Elliott's statement is admissible under the opposing party's statement exclusion from the hearsay rule, which Lilly disputes, there is no corroborating evidence that Moore was similarly situated to Welch at the time of his transfer or that his promotion was based on race and not some other performance measure.

In addition, Welch has no evidence that Lilly's non-discriminatory reason for transferring Welch at her existing pay grade level was pretextual.  Although Welch claims the job posting was for a pay grade level 56, she has made no showing to rebut Lilly's evidence that the new position encompassed Welch's existing pay grade level and that, under Lilly's policy, Welch transferred to the Parenteral IT position at the same pay grade level. [4]   Burton Aff. ¶¶ 5, 11 & 12 & Ex. 2 thereto; Elliott Aff. ¶ 4; Hervey July 8 Dep. at 15-21.

For these reasons, summary judgment in favor of Lilly is appropriate on Welch's failure to promote claim.

---

[4] The parties dispute whether or not Welch's testimony regarding the content of the job posting for the position in Parenteral IT, including the pay grade levels associated with the position, is admissible.  Dkt. No. 107, at 6; Dkt. No. 109-1, at 6-7.  Welch claims that Lilly never produced the original posting; therefore, Welch's testimony about what it contained is admissible as a non-hearsay admission.  Dkt. No. 109-1, at 6.  However, Lilly produced copies of the job posting that it was able to locate as well as additional information about the posting.  Therefore, the best evidence of the job levels associated with the position is contained in Lilly's documents, which Welch cannot contradict with hearsay.  Fed. R. Evid. 1002.

### 3.  <u>Wrongful Termination</u>

Welch asserts that Elliott's statement just prior to her termination, "We got your black ass now," is direct evidence of discriminatory intent.  Dkt. No. 103, at 30.  In addition, Welch relies on circumstantial evidence of discriminatory intent including: Teleford's persistence in referring to Welch as "girlfriend," despite Welch's repeated statements to him "that she considered the sobriquet to be racially charged;" Roesner's statement that her direct management would not address her discrimination complaints and calling senior level management "nigger lovers;" Hemmings' alleged statement that he would not take the word of a black woman over a white man; and other discriminatory treatment to which she was subjected during her employment under Elliott.  *Id.* at 31.  Welch also contends that Lilly's allegedly non-discriminatory reason for terminating her is pretextual because it failed to produce the electronic mail messages that Welch allegedly altered in native format; and Hemmings acknowledged "that if two employees shared passwords, as [Welch claims occurred here], there 'would be no way of knowing' who actually accessed the system at the time the emails were altered," which was ignored by Lilly in its findings; all of which creates a material question of fact as to whether or not Lilly actually believed the reason it gave for terminating Welch.  *Id.* at 32.

Lilly asserts that Elliott was not the decision maker with respect to Welch's termination and his comment to Welch, even if made, was nothing but a stray remark.  Dkt. No. 91, at 20-21; Dkt. No. 107, at 7-8.  In addition, Lilly contends that Teleford's use of the term "girlfriend" has no racial connotation.  Dkt. No. 107, at 8.  Further, Roesner's alleged comment regarding senior level management was not made in

connection with Welch's discharge.  Dkt. No. 107, at 8-9.  Lilly also argues that Welch's own testimony about Hemmings' allegedly racial remark is too vague to justify discriminatory intent.  Dkt. No. 107, at 9.  Even if it did, Lilly avers that the analysis of the relevant files was performed by Gorsuch, who had no prior connection to either Welch or Mitchell and there is no evidence that he had any motive to make the conclusions he did about which employee altered the electronic mail.[5]  Dkt. No. 107, at 9.  Further, Lilly argues that Welch's continued denial that she committed any misconduct that led to her termination cannot create an issue of material fact, even if Lilly made a mistake about who altered the mail.  Dkt. No. 107, at 11 (citing *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006); *Green v. Nat'l Steel Corp.*, 197 F.3d 894, 899 (7th Cir. 1999)).

The Court concludes that this is a claim that must be resolved by a jury.  In total, Welch's evidence creates inferences that might lead a jury to conclude that her race was a motivating factor in Lilly's decision to terminate her employment.  First, there is a factual dispute about whether or not Elliott was a decision maker with respect to terminating Welch's employment.  Lilly's own document states that Elliott was a decision maker.  Lilly's ICRCC Response, at LILLY-WELCH0006405.  Elliott testified and now claims the decision was made without him.  Elliott Dep. at 40-41; Elliott Aff. ¶ 8.  At this stage of the litigation, the Court must take as true the version more favorable to Welch,

---

[5] As previously discussed, Welch contends that Lilly should not be allowed to rely upon its metadata analysis of the electronic mail because it is hearsay or unduly prejudicial because Lilly did not produce the native format electronic mail such that Welch could perform her own analysis.  The Court has concluded that the analysis is not hearsay because it is offered to show what Hemmings reviewed and shared with other decision makers when they made the decision to terminate Welch's employment, and thus is probative of Lilly's state of mind.  *See* Section. B.2., *infra*.

which is that Elliott was a decision maker.  Therefore, his statement to her just prior to the meeting at which she was terminated is direct evidence of discriminatory animus.

Second, there are other factual disputes that, when resolved in favor of Welch, are circumstantial evidence of discrimination.  The Court will not decide as a matter of law whether or not the term "girlfriend" is racially charged.  Rather, taking the facts in the light most favorable to Welch, it is plausible that Teleford's (a white manager) use of the term to refer to a black-skinned subordinate is racially demeaning.  *Accord Lambert v. Peri Formworks Sys., Inc.*, No. 10 C 6789, 2013 WL 3814331, at *5 (7th Cir. July 24, 2013) (discussing the terms "donkey" and "gorilla" in the Title VII context and stating that a plaintiff is not required to present conclusive evidence that a potentially neutral term is a racial slur, only that the term could be considered such).  In the context of this case, Welch alleges that Teleford used the term repeatedly even after being told by Welch that she considered it racially charged.  Welch Dep. at 536-37.  Teleford also used the term during the meeting at which Welch's employment was terminated, which under the circumstances could be considered evidence of discriminatory intent.  *See Lambert*, at *5 (discussing suspicious timing as well as "other bits and pieces" as circumstantial evidence of discrimination).  Further, Roesner's prior comments to Welch regarding management being "nigger lovers" and his refusal to investigate Welch's claims of discrimination, could also be considered circumstantial evidence of discriminatory intent.  *Id.* (discussing "other bits and pieces").

Finally, Lilly has presented plausible evidence that it had a legitimate reason for Welch's discharge; however, the potential that Hemmings also exhibited racial animus during the investigation, coupled with multiple decision makers who exhibited various

forms of potential racial animus, might lead a jury to conclude that Lilly's proffered reason for firing Welch was pretextual. If a jury concludes that Hemmings made a statement to Welch that he would not believe a black women over a white male, his conclusion that Welch altered the electronic mail when he knew that Mitchell had access to Welch's account potentially becomes tainted with racial animus. As such, there is a material question of fact on whether or not Hemmings' recommendation to terminate Welch's employment under Lilly's policy was motivated by racial animus rather than objective criteria. Lilly relies heavily upon Gorsuch's role in the process of determining who made the alterations to the electronic mail to evidence the objectivity of its conclusions, but Hemmings testified that he made the determination that Welch had altered the relevant documents by reviewing information provided by Gorsuch as well as the documents themselves. Hemmings Dep. at 87-89. Hemmings conceded that if Mitchell had Welch's log in information there would be no way to know which one of them was logged in when the relevant alterations were made; but, after consideration of the electronic mail documents, he determined that Welch altered them. *Id.* Lilly offers no other evidence about why he came to that conclusion. Hemmings then presented his conclusions to the decision makers. *Id.* at 37-38. Because it is possible for a jury to conclude that each of the individuals involved in making the termination decision was motivated by discriminatory animus, Welch's wrongful termination claim must be decided by a jury.

## B. RETALIATION

Welch asserts that Lilly wrongfully retaliated against her for filing a complaint about racial discrimination by transferring her job responsibilities to her white co-worker,

Moore, and when it terminated her employment.  Dkt. No. 103, at 33-35.  Welch argues that her claims survive even under the Supreme Court's recent decision in *University of Texas Southwestern Medical Center v. Nassar*, 133 S.Ct. 2517 (2013), under Title VII; but even if she cannot survive the "but for" causation standard established in that case for Title VII, her claims survive under the motivating factor standard that should apply to her identical claim under 42 U.S.C. § 1981.  Dkt. No. 120, at 5-7.  Welch contends that after her formal complaint regarding racial discrimination in Bowsher's department and her multiple complaints of racial discrimination to Elliott, Stefanek, Teleford and Roesner, Elliot transferred "control of her major, high visibility, career-enhancing projects to Mr. Moore and [assumed] control of some of them himself."  Dkt. No. 103, at 33 (citing Welch Dep. at 594; Welch Decl. ¶ 8).  These transfers were made with no apparent reason, Welch argues, because at the time she had been deemed eligible for a merit increase and was meeting all of Lilly's performance expectations.  *Id.* at 34 (citing Elliot Dep. Ex. C-1, at 1).  Welch asserts that she was treated less favorably than Moore, which is evidenced by the transfer of her projects to him.  *Id.*

In addition, Welch asserts that Lilly's decision to terminate her employment was retaliatory.  *Id.* at 34-35.  Welch asserts that the timing of her termination, just weeks after she had complained to Elliott, Teleford and Stefanek about race discrimination is suspicious.  *Id.* at 35.  Further, retaliatory intent could be inferred from Elliott's, Stefanek's, Teleford's and Roesner's persistent efforts to prevent her from filing additional complaints about race discrimination.  *Id.*  Moreover, a jury could conclude from the circumstantial evidence of comments made to Welch by Elliott, Teleford, and Hemmings that Lilly's proffered reason for firing her is pretextual.  *Id.*

35

Lilly asserts that "it is impossible to reach any inference of causation between any particular complaint and the two events Welch contends are retaliatory." Dkt. No. 107, at 13 (citing *Dahl v. IHOP Mgmt. Hospitality of Racine, Inc.*, No. 07-C-280, 2008 WL 5130079, at *7 (E.D. Wis. Dec. 5, 2008)). In addition, Lilly contends that Elliot's removal of work assignments were not materially adverse because Welch has not provided specific evidence of what projects were allegedly removed and how their removal affected her employment or how her workload compared to Moore's at any particular time. *Id.* at 14. Further, Lilly argues that Welch was discharged for a legitimate non-discriminatory reason that is fully explained by "Mitchell's admittedly spontaneous complaint about Welch, and the intervening conclusion of Adam Hemming that Welch had falsified emails." *Id.* at 14-15. Lilly states that "Welch cannot establish causation generally with respect to her retaliation claims;" therefore, "[s]he certainly cannot establish the even more demanding 'but-for' standard required under *Nassar*." Dkt. No. 118, at 4.

### 1. <u>Standard</u>

The Court addresses the proper standard for analysis of Welch's retaliation claim first. Welch contends that her retaliation claims survive under either standard, but it surely survives under the motivating factor standard that she argues would apply to her retaliation claim under §1981. Because the standard might make a difference, it must be addressed. As Welch pointed out in her supplemental brief, in *Nassar* the Supreme Court analyzed the language of Title VII's retaliation provision and concluded that the motivating factor standard that applies to other claims brought under Title VII does not apply to Title VII retaliation claims. *Nassar*, 133 S.Ct. at 2528-31. Rather, "Title VII

retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."  *Id.* at 2528 (citing *Gross v. FBL Fin. Servs, Inc.*, 557 U.S. 167, 176, 129 S.Ct. 2343 (2009)).  In drawing this conclusion, the Supreme Court rejected the respondent's and the government's reliance on *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 445 (2008) (concluding that § 1981 "prohibit[ed] not only racial discrimination but also retaliation against those who oppose it"), for the proposition that Title VII's § 109, 42 U.S.C. § 2000e-2(m), also applied to retaliation even though it was not one of the enumerated unlawful employment practices therein. *Nassar*, 133 S.Ct. at 2529-31.  The *Nassar* Court specifically distinguished § 1981's broad-based prohibition of discrimination that encompassed retaliation from Title VII's "precise, complex, and exhaustive" treatment, and refused to use "the default rules that apply only when Congress writes a broad and undifferentiated statute."  *Id.* at 2530-31. This implies that the standard of proof for a retaliation claim under §1981 should be analyzed under the pre-*Nassar*, motivating factor standard first enunciated in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), *overruled* as to Title VII by 42 U.S.C. § 2000e-2(m).  *Accord Nicholson v. City of Clarksville*, No. 12-6318, 2003 WL 3746098, at *12 n.2 (6th Cir. July 17, 2013).  *See also Mabra v. United Food & Commercial Workers Local Union No. 1996*, 176 F.3d 1357 (11th Cir. 1999) (concluding that *Price Waterhouse* applied to § 1981 claims even after enactment of § 2000e-2(m)).

    But, the *Nassar* Court relied heavily upon its prior decision in *Gross*, the latter of which the Seventh Circuit has construed to hold "that, unless a statute (such as the Civil Rights Act of 1991) provides otherwise, demonstrating but-for causation is part of the plaintiff's burden in all suits under federal law."  *Fairley v. Andres*, 578 F.3d at 525-26

(7th Cir. 2009).  Therefore, this Court concludes that, after *Nassar*, Welch is required to show "but-for" causation for her retaliation claim under § 1981.

To survive summary judgment on her claim that Lilly retaliated against her because she complained about discrimination, Welch must present evidence from which a reasonable jury could conclude that Lilly removed her assignments or terminated her employment because of her complaints of discrimination.  *See Nassar*, 133 S.Ct. at 2534.  Lilly challenges Welch's proof of causation under both the direct method and the indirect method of proof.  Under the direct method, Welch must at least provide "a convincing mosaic of circumstantial evidence . . . by relying on evidence of 'suspicious timing, ambiguous statements oral or written, . . . and other bits and pieces from which a inference of [retaliatory] intent might be drawn.'"  *Hobgood v. Ill. Gaming Bd.*, ___ F.3d ___, No. 11-1926, 2013 WL 3599498, at *7 (7th Cir. July 16, 2013) (quoting *Coleman*, 667 F.3d at 860 (further quotations and citations omitted)).  Under the indirect method, Lilly claims it had a legitimate, non-discriminatory reason (or a legally permissible reasons) to terminate Welch's employment, which, at the summary judgment stage, shifts the burden of proof to Welch to show evidence that Lilly's reason is false.  *Id.* at *5 (citing *Vaughn v. Vilsack*, 715 F.3d 1001, 1006 (7th Cir. 2013)).

## 2.  Removal of Assignments

Welch's claim with respect to removal of her assignments is insufficient to create a question of fact.  Welch's conclusory self-serving statements cannot form the basis for a conclusion that changes to her work assignments were materially adverse or that such changes can be linked to any particular complaint about discrimination.  Welch provides no details with respect to the projects she claims were removed and no

evidence that anyone else perceived any such projects as "major, high-visibility, career enhancing" ones.  Further, Welch provides no details about Moore's workload or any information from which a trier of fact could conclude that Moore was similarly situated to Welch.  She provides her own declaration suggesting that she and Moore were the only non-management employees in the Parenteral IT department; however, the same statements reveal that most of Moore's work was supervised by Stefanek rather than Elliott, which implies that Welch was not similarly situated to Moore in all relevant aspects.  Without more factual support in the record, Welch's self-serving statements cannot defeat summary judgment.  *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 (7th Cir. 2004).

In addition, Welch provides no detailed account of which of her multiple complaints led to the reduction in job responsibilities.  Although Welch made numerous allegations of discrimination while in the Parenteral IT department, her vague allegation that she complained and then Elliott removed some assignments makes any causal link between the two speculative.  "*Post hoc ergo propter hoc* is not enough to support a finding of retaliation...."  *Bermudez v. TRC Holdings, Inc.*, 138 F.3d 1176, 1179 (7th Cir. 1998).

### 3.  Termination

With respect to Welch's claim that Lilly terminated her in retaliation for her complaints about discrimination, although it may be that the weakest element for Welch is the connection between the protected activity and her termination, the Court concludes that Welch has presented a convincing mosaic of circumstances that is sufficient to survive summary judgment.  Welch's termination occurred shortly after she

had complained to her supervisors about discrimination and approximately four months after she found the doll hanging by a noose at her desk and brought it to Elliott's attention.  Welch Dep. at 177-78, 188-98, 349, 353.  Therefore, there is a suspicious nexus between her complaints about discriminatory conduct and her termination.  In addition, as discussed at length in this Order with respect to Welch's racial discrimination claim (Section IV.A.3.), considering all the evidence of discrimination Welch presented, Elliott's comment "We got your black ass now," made the same day that Welch was notified of Lilly's decision to terminate her and Teleford's use of the term "girlfriend," at the termination meeting, would allow a reasonable jury to infer racial animosity that amounted to "a retaliatory witch hunt."  *Hobgood*, 2013 WL 3599498, at *8-9.  Crediting Welch's version of the facts, the supervisors in the Parenteral IT department studiously and repeatedly evaded Welch's attempts to bring her claims of discrimination to light.  Moreover, taken together with Welch's evidence that Hemmings' investigation might have been tainted with racial animus, *see* Section IV.A.3., Welch has support for her claim that Lilly's non-discriminatory reason for terminating her was false.  Under these circumstances, even with the "but-for" causation standard in *Nassar*, Welch's retaliatory discharge claim survives Lilly's summary judgment challenge.

## C.  RACIALLY HOSTILE WORK ENVIRONMENT

Welch claims that she experienced a racially hostile work environment under Bowsher that continued into her role in Parenteral IT under Elliott, which resulted in pay discrimination and wrongful discharge.   Specifically, Welch points to Bowsher's repeated references to "people like you," Bowsher's comments to Huff using the term "nigger" in reference to Welch, and Bowsher's statement that blacks should not be paid

as much as whites.  Dkt. No. 103, at 2 & 14-20.  In addition, Welch asserts that Teleford, Elliott and Roesner each made race-based comments including Teleford's continued use of the sobriquet "girlfriend" in reference to Welch despite knowing that Welch considered the term offensive; Elliott's statement just before she was fired, "We got your black ass now;" and Roesner's references to "senior level management as nigger lovers."  *Id.* at 16.  Welch further argues that racially hostile actions and statements of her coworkers while working under both Bowsher and Elliott contributed to the hostile work environment.  *Id.* at 17-20.  Welch contends that Lilly is liable under either the supervisor or the coworker harassment standards.  *Id.* at 20-23.  She points to her low merit increases in 2003 and 2004 and her termination as the tangible results of the hostile work environment.  *Id.* at 21.

Lilly asserts that Welch improperly links her alleged mistreatment under Bowsher with her alleged mistreatment under Elliott.  Dkt. No. 107, at 16-17.  In addition, Lilly argues that Welch cannot show that anything Bowsher may have done culminated in a tangible adverse action.  *Id.* at 17-19.  Lilly asserts that under Elliott, Welch has not established that the alleged supervisor and/or coworker harassment was either severe or pervasive.  *Id.* at 19-20; Dkt. No. 91, at 26-33.  Finally, Lilly states that Welch was discharged for legitimate, non-discriminatory reasons.  Dkt. No. 91, at 25.

To survive summary judgment on her racially hostile work environment claim, Welch must show a material question of fact on four elements: "(1) the work environment must have been both subjectively and objectively offensive; (2) race must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability."  *Yancick v. Hanna Steel*

*Corp.*, 653 F.3d 532, (7th Cir. 2011) (citing *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010)).  The Court must consider "'the entire context of the workplace,' not the discrete acts of individual employees," although different standards for liability apply to coworker as opposed to supervisor harassment.  *Vance v. Ball State Univ.*, 646 F.3d 461, 470-71 (7th Cir. 2011), aff'd, 570 U.S. ___, 133 S.Ct. 2434 (quoting *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1046 (7th Cir. 2002)).  The Court "will not find a hostile work environment for mere offensive conduct that is isolated, does not interfere with [Welch's] work performance, and is not physically threatening or humiliating." *Yancick*, 653 F.3d at 544 (citing *McPhaul v. Bd. of Comm'rs of Madison Cnty.*, 226 F.3d 558, 567 (7th Cir. 2000)).

With respect to coworker harassment, Welch must show that Lilly was negligent or that Lilly "knew or reasonably should have known about the harassment but failed to take remedial action."  *Vance* 133 S.Ct. at 2440-41 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 768-69 (1998) (Thomas, J., dissenting) (citing cases)).  However, with respect to supervisor harassment, if Welch shows that the supervisor's harassment culminated in a tangible employment action, Lilly may be held strictly liable.  *Id.* at 2442. If the supervisor's harassment did not culminate in a tangible employment action, Lilly may establish an affirmative defense to avoid liability, which includes showing that it exercised reasonable care to prevent and correct harassing behavior; and that Welch unreasonably failed to take advantage of the preventative or corrective opportunities provided by Lilly.  *Id.*

Lilly's argument that the Supreme Court's decision in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 120 (2002),  precludes Welch from linking

allegedly harassing behavior she experienced in the two departments she worked for is without merit.   The Seventh Circuit has concluded that "[a]s long as the employee remains within a single chain of command, [] and the same people control how the employer addresses problems in the workplace, there is only one employment practice, and all events may be considered . . . to determine whether that employment practice violates Title VII."   *Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383, 386 (7th Cir. 2007). *See also Vance*, 646 F.3d at 468-69 (discussing "an employer's continuing violation of Title VII 'based on the cumulative effect of individual acts'" (quoting *Morgan*, 536 U.S. at 115)); *Bright v. Hill's Pet Nutrition, Inc.*, 510 F.3d 766, 768 (7th Cir. 2007); *Bannon v. Univ. of Chi.*, 503 F.3d 623, 629 (7th Cir. 2007).   Welch has presented her own testimony that the higher level HR personnel at Lilly were common to both departments. Welch Decl. ¶ 9.  Further, Welch has consistently complained that her attempts to notify HR personnel at Lilly about harassment were alternatively minimized or ignored.   Welch Dep. at 239, 334, 352-33, 591-93.  This is enough for the Court to conclude that it is proper to consider all of the allegedly harassing behavior in both departments in which Welch worked.  *See Isaacs*, 485 F.3d at 386.

Welch has presented enough evidence such that a reasonably jury could conclude that her working environment was both objectively and subjectively hostile.[6] Welch complains about the following harassing behavior:   Bowsher told Welch that "people like you" are not expected to maintain the same level of knowledge and levels

---

[6] Lilly makes no real argument on the subjective component of this element of Welch's case.  The Court concludes that Welch's multiple complaints to her managers of racial discrimination are sufficient to evidence that she found her environment subjectively hostile or abusive.  *See Hrobrowski v. Worthington Steel Co.*, 358 F.3d 473, 476 (7th Cir. 2004).

of advancement of others in the group; Bowsher repeated referred to Welch as "you people" or "people like you;" Welch overheard Bowsher make comments to Huff to the effect that "the worst thing about a nigger is one that thinks she is not;" during Welch's annual review in October 2002, Bowsher told her that her "expectations were too high" for "someone like her;" during a 2002 Consulting Pairs meeting, Bowsher told Welch that blacks should not be paid as much as whites and that Welch should not try to make this an "EEOC issue" because Bowsher would ensure that "another one of you" was hired; Bowsher alternative ignored and berated Welch in front of Welch's co-workers, excluded Welch from team meeting and gave Welch "make work" assignments outside the scope of the team objective; Bowsher told Welch she was "a know it all" and a "thorn in her side" and then threatened to have Welch terminated if she told anyone; an unidentified co-worker left an Aunt Jemima syrup label on Welch's desk with a note that read, "I talked to your mama last night;" a white co-worker used the term "nigger" while Welch was in Bowsher's department; Elliott urged Bowsher not to file her complaint about race discrimination in Bowsher's department; after she filed the complaint, Elliott called her a "troublemaker" and told her to "get the gunnysack off of [her] back" and to not bring "issues . . . with race" to "his area;" Teleford repeatedly referred to Welch using the term "girlfriend," even though Welch had told him she found considered it racial harassment; while she worked in Elliott's group, several of Welch's white co-workers told her that "blacks are used to smelling shit;" Elliott, Teleford, Stefanek and Roesner ignored her repeated complaints about discriminatory conduct; instead of investigating Welch's complaints, Teleford told her he wanted to help her help herself; Roesner's response to complaints was to tell Welch she was in a different department

and her concerns would not be addressed and referred to senior level management as "nigger lovers;" Stefanek referred to senior level management as "yahoos" who could not "tell us how to run it over here;" in February 2004, Welch found a black doll with a noose around its neck hanging from her desk; Elliott removed the doll and encouraged Welch not to report the incident and she refrained from doing so partially on his advice; and Hemmings stated that he would not believe a black woman over a white man; Elliott commented, "We got your black ass now," just before Welch was fired.  Considering all of the circumstances, a reasonable person would find this environment hostile or abusive.  *See Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002).

At least three managers (Bowsher, Elliott and Roesner) during the three year period she worked in the two IT departments made overtly racially-charged comments either within Welch's hearing or directly to her.  Further, the multiple uses of the term "nigger" in Welch's work environment, by both supervisors and co-workers, quickly altered the conditions of Welch's employment and created a hostile work environment. *See Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) ("Perhaps no single act can more quickly 'alter the conditions of employment and create an abuse working environment' than the use of the unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986))).  Moreover, the discovery of an Aunt Jemima label with a derogatory note and, more particularly, the black doll with the noose around its neck, connote more than casual hostility, rather, they convey threats of physical harm and are meant to arouse fear.  *See Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 635-36 (7th Cir. 2009) (describing the racial discrimination and fear associated with a noose in the

45

history of blacks in the United States).  They clearly did so in this case.

In addition, Bowsher continually referred to Welch with the demeaning phrase "you people," which in light of Bowsher's two derogatory comments regarding blacks, could be perceived as racially-charged as well.  Similarly, Teleford's repeated use of the term "girlfriend" after being told by Welch that she considered the term racially demeaning could add to feelings of inferiority based on race.  On these facts, a jury could conclude that Welch's work environment was both objectively and subjectively hostile.

Turning to the remaining elements of her hostile work environment claim, Welch has presented evidence that the harassment may have culminated in her termination, which provides a basis for strict employer liability.  For the reasons discussed in prior Sections of this Order, however, she has not presented evidence that the harassment culminated in other allegedly adverse employment actions such as discriminatorily low merit increases or her lateral transfer to the Pareneral IT department.   *See* Sections IV.A.1 & IV.A.2.

If the Court were to separate the allegedly harassing behavior by department or supervisor, Welch's claim as to harassment under Bowsher alone would not lead to strict liability because Welch has failed to present evidence that her pay raise in 2003 was discriminatorily low.   Therefore, the same standard would apply to Welch's harassment claim as to Bowsher as it does to co-workers, which is negligence.  *Vance*, 113 S.Ct. at 2442.

Under Lilly's anti-discrimination policy, employees are encouraged to promptly report suspected incidents of harassment.  Burton Afft. ¶ 3 & Ex. 1 thereto.  However,

Welch never reported any coworker harassment (male coworkers using the term "nigger" over cubicle walls; and leaving an Aunt Jemima syrup label on Welch's desk) or Bowsher's alleged comments until approximately six months after she left Bowsher's department.   Welch Dep. at 119-20, 239, 334 & Ex. 43 thereto; Welch Decl. ¶ 9. Therefore, any duty of Lilly's to respond was delayed by Welch's failure to timely report any suspected incidents of harassment.   In other words, Lilly could hardly be asked to respond if it was unaware of the harassment.   *See Jajeh v. County of Cook*, 678 F.3d 560, 569 (7th Cir. 2012); *Jackson v. Cnty. of Racine*, 474 F.3d 493, 502 (7th Cir. 2007).

In addition, once Lilly was informed of Welch's claims of harassment while she was in Bowsher's group, it undertook an extensive investigation.   Welch was given several opportunities to direct the scope of the investigation and was asked to correct any misstatements or omissions of her concerns.   Welch Dep. at 232-33, 237, 242-43 & Exs. 43 & 45 thereto; Neumann Dep. at 19-23, 35, 66-68, 82-83 & Ex. 6-L thereto. Despite these opportunities, Welch never corrected Neumann's recitation of the issues he should investigate.   Neumann Aff. ¶ 4.   Although Welch makes much of the missing binder of information she gave Bob Klee ("Klee"), there is no evidence that she pressed Neumann, Klee, or Redmond about the binder.   No reasonable jury could conclude that Lilly was negligent in failing to uncover additional discriminatory behavior, such as the coworker statements heard over the cubicle walls or the Aunt Jemima label, in the face of Neumann's multiple attempts to clarify Welch's allegations.   *See Jackson*, 474 F.3d at 502.   Further, once Neumann undertook his investigation, none of the witnesses interviewed corroborated Welch's statements, including the individuals who conducted the Consulting Pairs session.   Burton Aff. ¶ 13 & Ex. 3 thereto; Neumann Dep. at 28-29,

31, 34, 36-40 & Ex. 6-F thereto; Neumann Aff. ¶ 6.  Consequently, Lilly determined that Welch's claims were without merit.  Neumann Dep. at 46, 93 & Ex. 6-U therto.  At least up to this timeframe, Lilly's response was both prompt and appropriate under the circumstances.

The problem for Lilly is that after this investigation, it never addressed Welch's ongoing complaints about racial harassment.  It is almost as if once it determined that Welch's claims of racial animus were unfounded, Welch had no credibility on the subject with respect to future racially-charged encounters.  In fact, thereafter, taking Welch's testimony as true, her supervisors in Parenteral IT blocked her efforts to trigger another investigation multiple times.  Welch Dep. at 177-78 (all managers failed to follow up), 342-49, 352 (Elliott's refusal to follow up); 669-71, 674 (complaints to multiple managers ignored); 533 & 592 (Stefanek ignores her complaints); 188-93, 349 (Elliott encourages Welch not to report doll with noose around its neck); 592-93 (Roesner ignores complaints), 391, 536-37 (Teleford repeatedly refers to Welch as "girlfriend" after being told by Welch that she finds the term racially charged).  Particularly troubling is Elliott's reaction to Welch finding the doll with a noose around its neck: to convince Welch it was in her best interests to ignore the implications of the doll in light of her search for another position within Lilly.  Whether Welch agreed with him or not, a jury could conclude that Elliott's advice was itself indicative of racial animus and discriminatory intent.  This incident occurred approximately four months prior to Lilly's decision to terminate Welch's employment.  A reasonable jury could conclude that the harassing behavior culminated in her termination.

Even if the jury concludes that the supervisor harassment did not culminate in

48

Welch's termination, after the investigation into Welch's allegations about racial discrimination in Bowsher's department, Welch's new supervisors were implicated in the harassing behavior and they repeatedly ignored Welch's complaints about other supervisor's harassment and co-worker harassment; therefore, a reasonable jury could conclude that Lilly was negligent in preventing the harassment as well.  Lilly presents no argument regarding the affirmative defense available in such circumstances under *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 764-65 (1998); therefore, its motion for summary judgment on Welch's racial harassment claim must be denied.

## V.  CONCLUSION

For the foregoing reasons, Plaintiff Cassandra Welch's motion for relief pursuant to Rule 56(d) of the Federal Rules of Civil Procedure and motion for an adverse inference are **DENIED**; and Defendant Eli Lilly & Company's Motion for Summary Judgment on Plaintiff Cassandra Welch's claims is **GRANTED in part and DENIED in part**.  The parties shall prepare to try Plaintiff Cassandra Welch's claims that Defendant Eli Lilly & Company discriminated against her because of her race when it terminated her employment; that it retaliated against her because of her complaints about racial discrimination when it terminated her employment; and that her supervisors created and/or permitted a harassing environment that culminated in her termination.

IT IS SO ORDERED this 15th day of August, 2013.


LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution attached.

Distribution:

Sandra L. Blevins
BETZ & ASSOCIATES
sblevins@betzadvocates.com

Benjamin C. Ellis
BETZ & BLEVINS
bellis@betzadvocates.com

Kevin W. Betz
BETZ & BLEVINS
kbetz@betzadvocates.com

Ellen E. Boshkoff
FAEGRE BAKER DANIELS LLP - Indianapolis
ellen.boshkoff@faegrebd.com

Joseph C. Pettygrove
FAEGRE BAKER DANIELS LLP - Indianapolis
joseph.pettygrove@FaegreBD.com

Rozlyn M. Fulgoni-Britton
FAEGRE BAKER DANIELS LLP - Indianapolis
rozlyn.fulgoni-britton@faegrebd.com

Matthew Louis Schmid
SANFORD HEISLER, LLP
mschmid@sanfordheisler.com

Jill Z. Julian
UNITED STATES ATTORNEY'S OFFICE
jill.julian@usdoj.gov